**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA,** *ex rel.* **HARMOHINDER S. BHATIA, M.D.,** | § § § | RELATOR'S COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *Et Seq.* |
| *Plaintiffs,* | § § | |
| **vs.** | § § | **FILED UNDER SEAL DO NOT PLACE ON PACER** |
| **ADVANCED CARDIOVASCULAR CARE CENTER, P.A.; ANNIE T. VARUGHESE, M.D.; and BABU VARUGHESE.** | § § § § § | **Civil Action No.** _____ |
| *Defendants.* | § § | **(Jury)** |

**COMPLAINT PURSUANT TO
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *Et Seq.***

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Harmohinder S. Bhatia, M.D., ("Relator") brings this action on behalf of the United States of America against defendants Advanced Cardiovascular Care Center, P.A. ("ACCC"), Annie T. Varughese, M.D., and Babu Varughese (collectively "Defendants") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

**I.**

**Introduction**

1. In violation of the False Claims Act, from at least 2012 to the present, Dr. Varughese and ACCC routinely and as a pattern and practice, knowingly presented and caused to be presented false and fraudulent Medicare claims for payment by performing and billing for medically unnecessary cardiology tests, including the costly enhanced external couterpulsion (or ECCP).

## II.

## Parties

2.    The United States is a plaintiff to this action. The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Center for Medicare and Medicaid Services ("CMS"), which administers the Medicare and Medicaid programs, and other federally funded health care programs.

3.    Defendant, Advanced Cardiovascular Care Center, P.A. ("ACCC"), is a physician's association organized under Texas law. ACCC provides treatments to patients focusing on the prevention and intervention of cardiac incidence. ACCC consists of the following three offices: the "Woodlands Office" located at 9191 Pinecroft Dr., Suite 125, Woodlands, Texas 77380, the "Peakwood Office" located at 800 Peakwood Drive, Suite 8C, Houston, Texas 77090, and the "Conroe Office" located at 600 River Pointe Dr. Conroe, Texas 77304.

4.    Defendant, Dr. Annie T. Varughese, M.D., is an individual residing in Montgomery County, Texas. At all material times, Dr. Varughese has been licensed to practice medicine in the State of Texas, and she has served as the principal owner, sole director, and sole officer of Defendant, Advanced Cardiovascular Care Center, P.A.

5.    Defendant, Babu Varughese, is an individual residing in Montgomery County, Texas. While not licensed as a physician in the State of Texas, the responsibility of the day-to-day management of Defendant, Advanced Cardiovascular Care Center, P.A., has been delegated to Babu Varughese.

6.    ACCC, Babu Varughese, and Dr. Annie Varughese, will be referred collectively herein as "Defendants."

7.      Relator, Harmohinder S. Bhatia, M.D., is a resident of Harris County, Texas, and at all material times, has been licensed to practice medicine in the State of Texas. Dr. Bhatia has been a cardiologist for over thirty-five (35) years. From April 1, 2012 through June 10, 2015, Dr. Bhatia was employed by Defendant, Advanced Cardiovascular Care Center, P.A., where he worked at Defendants' clinics located in Harris and Montgomery Counties, Texas. Dr. Bhatia is an "original source" of the information giving rise to the causes of action pled herein pursuant to 31 U.S.C. § 3730(e)(4)(A).

8.      Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## III.

### Jurisdiction & Venue

9.      Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, specifically 31 U.S.C. §§ 3732(a) and 3732(b), and also 28 U.S.C. §§ 1331, 1345.

10.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) in that, at all times material to this civil action, the Defendants are located in and transacted business in the District and/or submitted or caused the submission of false claims in the District.

## IV.

### The False Claims Act

11.     The Federal False Claims Act, 31 U.S.C. §§ 3729–3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(l)(A)–(B).

12.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l)(A)(i)–(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(l)(B).

13.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(i)–(ii).

14.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## V.

### The Medicare Program

15.      Title XVIII of the Social Security Act of 1942, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is administered by the Secretary of HHS through Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

16.      The Medicare Program is a federally subsidized health insurance system for disabled person or persons who are 65 years old or older and is comprised of four parts—Parts A through D. Medicare Parts A, C and D are not directly at issue in this case. Medicare Part B reimburses physicians charges for various medical services including outpatient medical care typically provided by a physician.

17.      Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals, who are age 65 or older, or disabled, may enroll in Part B to obtain benefits in return for monthly premiums as established by HHS. Payments under the Medicare programs, however, are often made directly to medical service providers rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case the provider submits the bill directly to Medicare for payment.

18.      Medicare enters into provider agreements with medical service providers to establish their eligibility to participate in the program. In order to be eligible for payment under the program physicians must certify:

I agree to abide by the Medicare laws, regulations and program instructions that apply to me…. The Medicare laws, regulations, and program instructions are available through a fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions….

Centers for Medicare & Medicaid Services, Medicare Enrollment Application (Form CMS-855I, p. 25), *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855I.PDF (last visited Jan. 18, 2016).

19.     Defendants were required to make and comply with this certification in order to be eligible to submit claims to Medicare.

20.     The United States provides reimbursement for Medicare claims through CMS. CMS, in turn, contracts with private insurance carriers (referred to as a Medicare Administrative Contractor or "MAC") to administer, process and pay Part B claims from the Federal Supplemental Medical Insurance Trust Funds (the "Part B Trust Fund"). In this capacity, the MAC acts on behalf of CMS.

21.     Medical providers are required to submit claims to the MAC for the area in which the services are rendered. In submitting these claims, medical providers are required to identify the services they performed by using the codes contained in the American Medical Association's Current Procedural Terminology manual, which are commonly referred to as "CPT" codes and/or Healthcare Common Procedure Coding System (HCPCS) codes which is a set of health care procedure codes based on CPT. Upon receiving the provider's claims, the MAC, applying its own and CMS policies, determines whether a procedure or service is adequately documented, whether it is medically necessary and whether or not the claim otherwise qualifies for payment. The MAC also computes the proper amount of the reimbursement for qualified claims.

22. Medicare reimbursement to providers varies depending on the type, level and complexity of the services rendered. This information is reflected in the code included in the claims submitted to the MAC.

23. Defendants submit claims to the MAC electronically. Before the MAC accepts electronically-submitted claims, each provider is required to agree in writing that it is responsible for the accuracy of the Medicare claims submitted on its behalf and that all claims submitted under its provider number will be accurate, complete and truthful. Prior to electronic submission of claims, providers submit hard copy certifications of the accuracy of their claims for reimbursement to Medicare.

24. A medical provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for Medicare services.

25. Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A).

26. Providers must provide economical medical services, and then, only when, and to the extent, medically necessary. 42 U.S.C. § 1320c-5(a)(1).

27. The federal Medicare regulation excludes from payment services that are not reasonable and necessary. 42 C.F.R. § 411.15(k)(1).

## VI.

### Statement of Facts

28. Dr. Bhatia was employed at ACCC from April 1, 2012 through June 10, 2015. During the time of his employment, and upon information and belief, since the inception of ACCC to the

present, as explained herein, Defendants have knowingly submitted claims to Medicare for services they knew were not medically necessary.

29.    Dr. Bhatia estimates that Defendants service about 150 patients per month and that about 20-30% of these patients were Medicare beneficiaries.

30.    Defendants had, on location, at their clinics the necessary equipment to conduct diagnostic testing, EKG, dopplar, event monitor and removal, echocardiogram, stress test, stress echocardiogram, enhanced external counter pulsation ("EECP"), nerve conduction studies, nuclear cardiology, and ultrasound.

31.    As a matter of routine, Defendants had a policy of giving new patients a battery of diagnostic and ancillary tests and procedures, even in instances where the patients had no medical need for most, if not all, of the tests.

32.    Dr. Varughese commonly ordered a battery of tests and procedures for the new patients she saw. Many, if not all, of the tests and procedures ordered by Dr. Varughese were medically unnecessary.

33.    As detailed below, Dr. Varughese and ACCC staff regularly included non-existent symptoms in the form of a "cut and paste' in the "general appearance" section of the patient charts to justify unnecessary medical procedures.

34.    On patients' follow-up visits to the clinics, Defendants regularly ordered another battery of unnecessary tests.

35.    The tests and procedures ordered by Defendants were performed at their own clinics. Therefore, Defendants would obtain reimbursement for the unnecessary testing and procedures from Medicare and other payors.

36.    An example of unnecessary testing is, Defendants routinely ordered unnecessary Enhanced external counterpulsation, or EECP. EECP is a noninvasive treatment that uses timed, sequential inflation of pressure cuffs on the calves, thighs, and buttocks to augment diastolic pressure, decrease left ventricular afterload, and increase venous return. Augmenting diastolic pressure displaces a volume of blood backward into the coronary arteries during diastole when the heart is in a state of relaxation and the resistance in the coronary arteries is at a minimum. The resulting increase in coronary artery perfusion pressure may enhance coronary collateral development or increase flow through existing collaterals. In addition, when the left ventricle contracts, it faces a reduced aortic pressure to work against, since the counterpulsation has somewhat emptied the aorta.

37.    The Medicare Manual states that although EECP devices "are cleared by the Food and Drug Administration (FDA) for use in treating a variety of cardiac conditions, including stable or unstable angina pectoris, acute myocardial infarction and cardiogenic shock, ***the use of this device to treat cardiac conditions other than stable angina pectoris is not covered***, since only that use has developed sufficient evidence to demonstrate its medical effectiveness." Center for Medicare and Medicaid Services (CMS). External Counterpulsation Therapy. National Coverage Determination, Manual, Ch. 1, Part 1, § 20.20 (Rev. 187, Dec. 10, 2015) (emphasis added)[1]

38.    More specifically, the Medicare National Coverage Determination states:

Effective for services performed on or after July 1, 1999, coverage is provided for the use of ECP for patients who have been diagnosed with disabling angina (Class

---

[1]*Available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_part1.pdf (last visited Jan. 18, 2016).

III or Class IV, Canadian Cardiovascular Society Classification or equivalent classification) who, in the opinion of a cardiologist or cardiothoracic surgeon, are not readily amenable to surgical intervention, such as PTCA or cardiac bypass, because:

1.    Their condition is inoperable, or at high risk of operative complications or postoperative failure;

2.    Their coronary anatomy is not readily amenable to such procedures; or

3.    They have co-morbid states that create excessive risk.

*Id.*

39.    A full course of EECP consists of 35 one-hour treatments, which may be offered once or twice daily, usually 5 days per week. The multiple components of the procedure include the use of the device itself, finger plethysmography to follow the blood flow, continuous electrocardiograms (EKGs) to trigger inflation and deflation, and optional use of pulse oximetry to measure oxygen saturation before and after treatment.

40.    Payment is made to hospitals or outpatient centers for the facility costs it incurs under Medicare Part B on a reasonable cost basis, by billing HCPCS code G0166.[2] Each session is billed and the provider receives approximately $137 per session; totaling approximately $4795 per patient per EECP treatment.

41.    In sum, EECP is very rarely ever medically justified. However, despite the Medicare coverage determination, Defendants have implemented EECP as a cash-flow generating service prescribed by the Defendants in virtually all of their cardiac patients. Upon information and belief, the Defendants own three EECP devices or machines and endeavor to keep machines operating full time in order to establish a profit center for the Defendants.

---

[2] *See* Medicare Claims Processing Manual Chapter 32, Section 130 (Rev. 3181, Jan. 30, 2015), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c32.pdf (last visited Jan. 18, 2016).

42.    In addition to EECP, among the medically unnecessary tests routinely ordered by Defendants were stress tests, nuclear stress tests, echocardiograms, stress echocardiograms, Doppler of the arteries and veins, cardiodynamics, event monitor and removal, polysomnography, ultrasound of the abdomen, aorta, carotid, and renal arteries.

43.    Additionally, when Defendants ordered blood work for patients, they routinely tested for an excessive number of potential conditions and diseases.

44.    Specifically, at the Peakwood Office, Dr. Bhatia regularly observed the ordering of medically unnecessary diagnostic tests and procedures, without consulting a physician, by Defendants' non-physician managers.

45.    Dr. Bhatia states that a review of Defendants patients' medical records would reveal that the majority of tests and procedures Defendants performed on patients were not medically necessary.

46.    While the instances where medically unnecessary tests were ordered are too numerous to list in this Complaint, the following are some examples of this widespread practice that occurred at Defendants' Peakwood Drive clinic:

(1)    A.T., age 74, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient A.T. to receive the following battery of tests: Echocardiogram, Cardiac Stress Test, Carotid Intima-Media Thickness Test (CIMT), Stress Echocardiogram, Ankle-Brachial Index test (ABI), CVProfiler test, Event Monitor, Abdominal Ultrasound, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(2)    S.R., age 79, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress

notes, Varughese ordered patient S.R. to receive the following battery of tests: Nuclear Stress Test, Echocardiogram, Carotid Intima-Media Thickness Test (CIMT), Ankle-Brachial Index test (ABI), CVProfiler test, Brain CT, Brain MRI, Chest X-Ray, Computed tomography (CT) of abdomen and pelvic region, Renal Ultrasound, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(3)   B.R., age 83, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient B.R. to receive the following battery of tests: Cardiac Catheterization, Echocardiogram, Carotid Intima-Media Thickness Test (CIMT) Stress Echocardiogram, Ankle-Brachial Index test (ABI), Carotid Intima-Media Thickness test (CIMT), CVProfiler test, Renal Ultrasound, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(4)   A.H., age 85, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient A.H. to receive the following battery of tests: Nuclear Stress Test, Boston Heart Diagnostic Test, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(5)   D.L., age 84, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient D.L. to receive the following battery of tests: Echocardiogram, Carotid Intima-Media Thickness Test (CIMT), Stress Echocardiogram, CVProfiler test, Boston Heart Diagnostic Test, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(6)   S.M., age 71, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress

notes, Varughese ordered patient S.M. to receive the following battery of tests: Electrocardiogram, Echocardiogram, Stress Echocardiogram, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(7) J.A., age 75, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient J.A. to receive the following battery of tests: EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(8) P.E., age 72, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient P.E. to receive the following battery of tests: Abnormal Cardiovascular Function Study, Lexiscan Cardiolite Stress Test, Nuclear Stress Test, Electrocardiogram, Coronary Angiogram, Left Heart Catheterization, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(9) J.C., age 70, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient J.C. to receive the following battery of tests: Nuclear Stress Test, CVProfiler test, Ankle-Brachial Index test (ABI), Carotid Intima-Media Thickness Test (CIMT), Electrocardiogram, Echocardiogram, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(10) B.H., age 69, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient B.H. to receive the following battery of tests: Echocardiogram, Stress Echocardiogram, Nuclear Stress Test, Carotid Intima-

Media Thickness Test (CIMT), Ankle-Brachial Index test (ABI), Carotid ultrasound, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(11)   D.J., age 68, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient D.J. to receive the following battery of tests: Echocardiogram, Carotid Intima-Media Thickness Test (CIMT), CVProfiler test, Nuclear Stress Test, Catheterization, Event Monitor, Ankle-Brachial Index test (ABI), and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(12)   J.M., age 68, male, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient J.M. to receive the following battery of tests: Echocardiogram, Stress Echocardiogram, Carotid Intima-Media Thickness Test (CIMT), Carotid Doppler, Catheterization, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

(13)   A.C., age 68, female, came to ACCC for treatment of cardiac disease. Patient did not have symptoms of refractory angina. According to patient progress notes, Varughese ordered patient A.C. to receive the following battery of tests: Nuclear Stress Test, Electrocardiogram, Event Monitor, and EECP. Upon information and belief, the patient received some, if not all, of the unnecessary tests.

47.   Moreover, "the General Appearance" evaluations contained in the above-referenced patients' charts were not performed. Instead, these "General Appearance" evaluations are exact word-processing "cut and paste" descriptions, regardless of the age or gender of the particular patients stating:

no acute distress. HEENT: extra ocular movements intact (EOMI), pupils equal, round, reactive to light and accommodation (PERRLA). Oral Cavity: no significant abnormality. Neck, Thyroid: jugular venous distention (JVD) flat, no lymphade-nopathy, supple, soft carotid bruits. Breasts: not examined. Lungs: clear to auscul-tation bilaterally. Heart: normal rate, regular rhythm, normal S1S2, 2/6 SYSTOLIC MURMUR. Abdomen: no masses appreciated, soft, non-tender/non-distended, bowel sounds normoactive. Neurologic Exam: cranial nerves II-XII grossly intact. Skin: warm, dry, no rashes appreciated. Peripheral Pulses: normal (2+) bilaterally dorsalis pedis (DP)/posterior tibial (PT). Back: no costovertebral angle (CVA) ten-derness. Extremities: no clubbing, no cyanosis, no edema. Male Genitalia: not ex-amined. Rectal not performed.

48.     On information and belief, Defendants' other clinics regularly ordered and billed to Medicare unnecessary diagnostic tests.

49.     Disturbed by the performing and billing of the medically unnecessary tests, Dr. Bhatia brought this to the attention of Dr. Varughese. Dr. Varughese denied that she and ACCC were performing and billing for medically unnecessary tests, and would encourage Dr. Bhatia to perform and bill for more medically unnecessary tests stating, "how do you expect me to make any money if you don't bill for these tests." When Dr. Bhatia refused to order and bill for these medi-cally unnecessary tests, Dr. Varughese stopped referring patients to Dr. Bhatia, presumably because she would refer patients to other physicians and medical staff that were willing to order, perform and bill for these medically unnecessary tests. In fact, ACCC has had a lot of turnover in employees, upon information and belief, because these employees did not want to perform and bill for medi-cally unnecessary tests as instructed.

50.     In sum, from at least April 2012, and upon information and belief before that time, to the present time, Defendants performed medically unnecessary EECP and other cardiac tests on Medicare beneficiaries. Defendants then submitted claims for reimbursement to Medicare for

these medically unnecessary procedures. In doing so, Defendants submitted or caused the submission of false claims to the government, in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

### First Cause of Action

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009)

51.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

52.     Defendants knowingly submitted and caused the submission of false or fraudulent claims for payment or approval to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1) (1986), and 31 U.S.C. § 3729(a)(1)(A) (2009).

53.     By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### Second Cause of Action

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(2) (1986) and 31 U.S.C. § 3729(a)(1)(B) (2009)

54.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

55.     Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government. Defendants' false reports caused the submission of false and inflated claims for Medicare payments to the

55.    United States in violation of 31 U.S.C. § 3729(a)(2) (1986) and 31 U.S.C. § 3729(a)(1)(B) (2009).

56.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## Prayer for Relief

**WHEREFORE**, Relator, on behalf of the United States, demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the False Claims Act.

Further, Relator requests that it receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action

## Demand for Jury Trial

Trial by a jury is demanded in this case and the fees therefore will be tendered pursuant to the Rules of Court.

DATED: January 19, 2016

Respectfully Submitted,

**PENDERGRAFT & SIMON, LLP**

/s/ *William P. Haddock*
Robert L. Pendergraft
Texas Bar No. 15743500
S.D. Tex. Adm. No. 00730
rlp@pendergraftsimon.com
William P. Haddock
Texas Bar No. 00793875
S.D. Tex. Adm. No. 19637
whaddock@pendergraftsimon.com
2777 Allen Parkway, Suite 800
Houston, Texas 77019
Tel. (713) 528-8555
Fax. (713) 868-1267


**BERGER & MONTAGUE, P.C.**

Shauna B. Itri
N.J. Bar No. 044372005
Pa. Bar No. 201611
sitri@bm.net
1622 Locust Street
Philadelphia, PA 19103
Tel. (215) 875-3049
Fax. (215) 875-4604

*Counsel for Harmohinder S. Bhatia, M.D.*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
The United States of America, ex rel., Harmohinder S. Bhatia, M.D.

**DEFENDANTS**
Advanced Cardiovascular Care Center, P.A., et al.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Harris
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert L. Pendergraft & William P. Haddock, Pendergraft & Simon, LLP
2777 Allen Parkway, Suite 800
Houston, TX 77019; Tel. 713-528-8555

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                       *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability **PERSONAL PROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 690 Other | ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 | ☒ 375 False Claims Act ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV ☐ 850 Securities/Commodities/ Exchange |
| ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability ☐ 196 Franchise | | | | **PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark | |
| | | | **LABOR** ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Management Relations ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☐ 893 Environmental Matters ☐ 895 Freedom of Information Act ☐ 896 Arbitration ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| **REAL PROPERTY** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | **CIVIL RIGHTS** ☐ 440 Other Civil Rights ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 445 Amer. w/Disabilities - Employment ☐ 446 Amer. w/Disabilities - Other ☐ 448 Education | **PRISONER PETITIONS** **Habeas Corpus:** ☐ 463 Alien Detainee ☐ 510 Motions to Vacate Sentence ☐ 530 General ☐ 535 Death Penalty **Other:** ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS—Third Party 26 USC 7609 **IMMIGRATION** ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | ☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729

Brief description of cause:
False claims case

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____